### A. H. EVERETT v. THE STATE.

*No. 3331.   Decided March 12.*

1. **Murder —Evidence of Acts and Conduct of Defendant, Showing His Animus Toward Deceased.**—On trial for murder, where the testimony showed that deceased had made a violent attack upon defendant a few days before the homicide, and that he had threatened to kill defendant, and that he was a violent and dangerous man and likely to execute his threats, *held*, that it was competent for the defendant to prove by his family physician, who was a mutual friend of the parties, that defendant requested said physician to see deceased and endeavor to compromise the difficulty between them; and further, to prove that at the time said physician advised defendant to remain on his own premises until he could see deceased and settle the difficulty, which advice defendant had followed, and did remain at his home until deceased invaded his premises, when the killing occurred. Such testimony was admissible to show the animus and feeling of defendant toward the deceased, and his desire for peace.

2. **Evidence—Privileged Communications Between Attorney and Client.** Where the killing occurred on Tuesday, and the defendant proposed to show that on the previous Saturday, the day after his first difficulty with the deceased, that deceased

had an interview with his attorneys, in which he threatened to take the life of the defendant, and asked the advice of said attorneys as to how he could avoid the legal consequences of killing defendant, which testimony the court excluded, because it embraced confidential communications between attorney and client, *held*, that the court erred, and that such testimony would not come within the rule of privileged communications between attorney and client.

3. **Irrelevant and Immaterial Testimony.** — Where the State was permitted to prove, over objection of defendant, that the pistol found upon the body of deceased could only fire center-fire cartridges, but was loaded with rim-fire cartridges, which it was impossible for it to explode, *held*, that the evidence was irrelevant and immaterial, since defendant could not have known the condition of the pistol, the manner in which it was loaded, nor the fact that it could not be fired by deceased.

4. **Mutual Combat — Charge of Court.** — Where there is no evidence in a case warranting or calling for such a charge, it is error for the court to submit an instruction as to mutual combat.

APPEAL from the District Court of Kaufman. Tried below before Hon. Anson Rainey.

Appellant was indicted for the murder of one J. E. Beason, and at his trial was convicted of murder in the second degree, his punishment being assessed at eighteen years in the penitentiary. The material facts in the case are sufficiently stated in the opinion of the court.

*Dillard & Stroud* and *Joseph Huffmaster*, for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State, in his brief, remarks, "the State submits the case upon the record, for what it is worth."

WHITE, PRESIDING JUDGE.—Appellant was indicted for the murder of one Beason, and on his trial was convicted of murder in the second degree, and his punishment assessed at a term of eighteen years in the penitentiary.

In brief, the substantial and essential facts as they are made to appear by the record before us are as follows: The defendant had rented land from Beason for cultivation. The house in which he lived was situated inside the field in which he raised his crops, but some forty or fifty steps from the gate which led into the pasture in front of the house, which pasture was used by Beason, the deceased. Just beyond this gate, and inside the pasture, was the well, which was used by the defendant in connection with his premises. Beason, the deceased, lived some distance from the defendant beyond the pasture. The testimony in the main shows that Beason was high-tempered, violent, and over-bearing, if not a dangerous man, and that he was one who was likely to execute any threat he might make. All the testimony on the other hand shows that defendant was a peaceable, quiet, and law-abiding citizen. It appears that Beason became dissatisfied with the mode

and manner in which the defendant was cultivating the land he had rented from Beason, and that Beason had told defendant if he did not do better in the cultivation of the crop he (Beason) would put hands in there and work it out. This was the beginning of the trouble between them.

The homicide occurred on Tuesday evening, 23d of June, about 5 o'clock. Deceased was killed inside the pasture above spoken of, and between the gate and the well, which was some eight or ten steps to the left of the gate, and in a southwesterly 'direction. After he was shot his body lay with head close to the well, and his feet pointing in the direction of the gate. He was shot through the right breast with several buckshot. When his body was examined by those who arrived first upon the ground, it was found that he had a bridle upon his left arm and shoulder, and a loaded pistol was sticking out of his left pants pocket, the handle of the pistol being plainly visible.

On Friday before the killing, as defendant was returning from town, where he had been to purchase family supplies, and when within about a hundred yards and in plain view of his house, he was overtaken by the deceased (Beason) who attacked him with a knife, and defendant warded off the blows with a stick. Beason cursed defendant in a violent manner; told him that he intended to put hands in the crop and work it out if he had to wade in blood up to his knees; also told defendant to get his gun and meet him at the gate, and they would shoot it out; he also told defendant that he intended to kill him if it was the last act of his life. On the next day Beason went to the town of Kaufman, and there purchased a pistol from the witness Bishop, who was a gunsmith; and he was very particular to ask Bishop, before he bought it, if he was certain the pistol would shoot. This was the same pistol which was found sticking in the pants pocket of the deceased after the killing. It is shown by the testimony, further, that the defendant's wife was in very bad health, and had been so for sometime; that on account of the first difficulty on Friday evening, which difficulty she had witnessed, she had a serious nervous spell, and Dr. Ball, the family physician, was called in to see her.

Defendant proposed to prove by Dr. Ball, that he (the defendant) told him of the circumstances of the difficulty, and asked his advice as to what should be done; that he requested Dr. Ball to see the deceased, and to tell him that he was willing to do anything in order to settle their troubles; that if he had done him any wrong he would apologize to him for it, and that he was willing to leave their differences to their neighbors to settle, if it was advisable and probable that it could be settled in that way. He proposed further to prove by Dr. Ball, 'that Ball advised him to stay at home on his own premises until he (Ball) could see the deceased, and try to settle the matter. He proposed further to show, that on Sunday preceding the homicide the witness Ball

was again at his house, and that Ball had told him (defendant) that he had not yet seen the deceased, and again advised defendant to remain at his home until he could see the deceased, and endeavor to have a settlement of the troubles between them. This testimony the defendant proposed in connection with the fact of the previous trouble, and as illustrative and explanatory of the fact that he had remained on his own premises from the time of the first difficulty up to the time of the killing. Upon objection by the State to this evidence that it was irrelevant and self-serving, it was excluded by the court.

It is further shown by the testimony, that on Saturday—the day after the first difficulty—the deceased, while in the town of Kaufman, and after he had purchased the pistol as above stated, went to the office of his attorneys, Woods & Gossett, and had an interview with them about his troubles with the defendant, in which interview he then and there threatened to take the life of the defendant, and asked the advice of his attorneys how to avoid the legal consequences of the killing of defendant. This testimony was also objected to by the State, upon the ground that it embraced confidential communications between attorney and client, and the objection was sustained by the court and the testimony excluded.

Besides the defendant, his wife and 13-year-old daughter were the only eye-witnesses to the killing, and there is but very little, if any, difference in the facts as detailed by them. In substance, these facts are, that the defendant's dogs were baying something in the field back of his house. That defendant got his double-barrel shotgun, which he had loaded with buckshot, as he testified, to defend himself whenever it became necessary to do so, and went to the back of his field to see what his dogs were after, and finding that it was a polecat, started to return home, and when he had reached a distance of two or three hundred yards of his house he heard screaming there. This screaming was by his wife and children. They testified, that the deceased came up to the gate, which, as above stated, is some forty or fifty yards from the front of the house, and inside the pasture. That he called to defendant by name, and told him to come out; that he intended to kill him. They commenced screaming, and the wife begged him to go away and let her husband alone. That he said he intended to kill him if it was the last act of his (deceased's) life, and flourished a pistol. Defendant, hearing the screams, ran up to the house, went around in front, saw the deceased at the gate, begged him to leave, telling him that his wife was almost in a dying condition, and that he was the cause of it. Deceased refused to leave, saying he was on his own premises. Defendant walked up close to the gate, when, he says, deceased ran his hand down toward his pocket, and with the other hand made a motion as though he would grab the gun; that he fired and killed him.

We are of opinion that the court erred in excluding the proposed testimony of the witness Ball with regard to defendant's proposals of compromise with the deceased through this witness, and the further fact that the witness advised him to remain at home, which he did, from the time of the first difficulty up to the time of the homicide. This testimony tended to show the motives, feelings, and intentions of the defendant, and were legitimate to be considered by the jury in determining the credibility of his statements with regard to his motives and acts at the time of the killing. It tended to show the feelings and animus of defendant.

We are further of opinion that the court erred in excluding the proposed testimony of the witness Gossett as to deceased's advising with him as an attorney how to avoid the legal consequences of killing the defendant. The testimony sought to be elicited from this witness did not come within the rule of privileged communications between attorney and client. Orman v. The State, 22 Texas Ct. App., 604; 24 Texas Ct. App., 495; Whart. Crim. Ev., 9 ed., sec. 504, and notes.

Again, the court permitted testimony, over objection of defendant, to the effect that the pistol found upon the deceased's body was a pistol which could only fire center-fire cartridges, and that it was loaded, when taken from the body, not with center-fire cartridges, but with rim-fire cartridges, and that it was impossible that the pistol could have been discharged as loaded. This testimony is wholly irrelevant and immaterial, and could have illustrated no issue in the case. Defendant could not have known how the pistol was loaded and that it was impossible to be fired as loaded; and the evidence tended in no manner to characterize the acts of either of the parties in connection with the killing. It does not show that deceased did not know that the pistol could not be fired.

Again, the court erred in submitting in its charge to the jury the issue of mutual combat, there being no evidence upon which to base such a charge, as we read the facts disclosed by the record.

Because of the errors above indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Davidson, J., absent.